SCOTT PAPER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 1775–73, 2897–74.     Filed April 28, 1980.

*Thomas V. Lefevre, Herbert Odell,* and *Alvin C. Warren, Jr.,* for the petitioner.

*Gerald V. May, Jr.,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in the Federal income tax of petitioner as follows:

| Docket No. | Taxable year | Deficiency | Docket No. | Taxable year | Deficiency |
|---|---|---|---|---|---|
| 1775–73 | 1961 | $111,876 | 2897–74 | 1965 | $225,950 |
| | 1962 | 17,155 | | 1966 | 98,888 |
| | 1963 | 14,968 | | 1967 | 70,274 |
| | 1964 | 23,303 | | 1968 | 116,386 |
| | | | | 1969[1] | 98,552 |

These cases have been consolidated for trial, briefs, and opinion. The issues presented for our decision are:

(1) Whether petitioner is entitled to deduct interest on converted debentures which accrued from the last interest payment date to the date of conversion; and if so, whether the conversion of debentures into stock resulted in income to petitioner by reason of the cancellation of indebtedness;

(2) Whether, and to what extent, primary electric improvements qualify as section 38 property under section 48(a)(1), I.R.C. 1954,[2] for purposes of determining petitioner's investment credit.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

---

[1]Petitioner filed a claim for refund for the taxable year 1969 which has not been disallowed by respondent and which was placed in issue in the petition. The claim for refund involves the amount of unused foreign tax credit for the taxable year 1971 and the amount of such credit that can be carried back and credited against petitioner's Federal income tax liability for 1969. There is no substantive dispute between the parties regarding the application of foreign tax credit carryback to 1969; however, the amount, if any, of such carryback is in dispute. Determination of the amount of such carryback is dependent upon resolution of issues concerning the taxable year 1971 and upon petitioner's tax liability for 1969 determined without regard to such carryback. In light of the foregoing facts, there is no substantive issue to be decided with respect to the claimed carryback. Its amount, determined as described above, will be reflected in the computation under Rule 155, Tax Court Rules of Practice and Procedure, for docket No. 2897–74.

[2]All section references are to the Internal Revenue Code of 1954 as amended.

Scott Paper Co. (hereinafter Scott or petitioner) is a corporation organized under the laws of the State of Pennsylvania and, at all times pertinent to these cases, has had its principal place of business in Philadelphia, Pa. Scott filed its Federal income tax returns for the taxable years in issue with the Office of the Internal Revenue Service, Philadelphia, Pa. Scott files its Federal income tax returns on a calendar year basis and, in computing its tax liability, employs the accrual method of accounting.

*Issue 1. Interest on Debentures*

On March 31, 1956, Scott executed an Indenture Agreement with J. P. Morgan & Co., Inc. That agreement set forth the terms and conditions covering 3-percent convertible debentures (hereinafter the debentures) which were subsequently issued by Scott. The debentures were issued in the following denominations and forms: $100 with interest coupons attached, $1,000 with interest coupons attached, and $1,000 without interest coupons.

Interest on the debentures was payable on March 1 and September 1 of each year until maturity. With respect to the payment of interest, the debenture certificates provided as follows:

Scott Paper Company * * * hereby promises * * * to pay interest on [the specified] principal sum at [the specified] offices in [specified] coin or currency from April 3, 1956, until payment of said principal sum has been made or duly provided for, at the rate of 3 percent per annum, semi-annually on March 1, and September 1 in each year, but until maturity only upon presentation and surrender of the coupons for such interest installments hereto attached as they severally mature.

Scott's covenant under the indenture agreement with respect to the payment of interest was as follows:

Section 2.01. The Company will duly and punctually pay the * * * interest on the Debentures at the times and places and in the manner specified in the Debentures or in the coupons, if any, thereto belonging. The interest on the coupon Debentures becoming payable on or prior to the maturity of the Debentures shall be payable only upon presentation and surrender of the several coupons for such interest installments as are evidenced thereby and as such coupons mature. The interest on registered Debentures without coupons shall be payable only to or upon the written order of the registered holders thereof.

The debentures were convertible into shares of Scott common stock. With respect to conversion of the debentures, the debenture certificates provided as follows:

The holder of this Debenture is entitled, at his option * * * to convert this Debenture at the principal amount hereof, or any portion hereof which is $100 or a multiple thereof, into Common Shares of the Company, as said shares shall be constituted at the date of conversion, at the conversion price of $77, for each Common Share, or at the adjusted conversion price in effect at the date of conversion determined as provided in the Indenture, upon surrender to the Company of this Debenture for conversion * * * with all unmatured coupons, if any, appertaining hereto, all in accordance with the terms and provisions of the Indenture. As provided in the Indenture, the conversion price is subject to adjustment in certain cases as set forth therein. No adjustment or payment is to be made on conversion for interest accrued hereon or for dividends on securities issued on conversion. The Company is not required to issue fractional shares upon any such conversion, but shall make adjustment therefor in cash on the basis of the current market value of such fractional interest (computed as provided in the Indenture) or, at its option, may issue scrip certificates in respect thereof, all as provided in the Indenture.

The adjustments to the conversion price described in the debenture certificate were to be made when Scott issued additional common shares without consideration, or for consideration less than $77, or when Scott changed the number of outstanding common shares by combination or reclassification of shares, splitup, etc. The indenture agreement set forth the following conversion procedure in language similar to that used in the debenture certificates:

Section 4.02. In order to exercise the conversion privilege, the holder of any Debenture to be converted shall surrender such Debenture, together with all unmatured coupons thereto appertaining, to the Company * * * and shall give written notice to the Company * * * that the holder elects to convert such Debenture or a specified portion thereof. * * * As promptly as practicable after the receipt of such notice and the surrender of such Debenture as aforesaid, the Company shall issue and shall deliver * * * to such holder * * * a certificate or certificates for the number of full shares issuable upon the conversion of such Debenture * * * and cash or scrip, as provided in Section 4.03 hereof. * * * No adjustment or payment shall be made for interest accrued on any Debenture that shall be converted or for dividends on any Common Share that shall be issued upon the conversion of such Debenture * * *

The following table shows for calendar years 1961 through 1969 the principal amounts of debentures which were converted into Scott common stock and the number of shares of common stock into which those amounts were converted.

| Year | Principal amount of converted debentures | Number of shares of common stock issued on conversion |
|---|---|---|
| 1961 | $44,246,100 | 1,719,464 |
| 1962 | 9,818,300 | 382,077 |
| 1963 | 7,911,200 | 308,018 |
| 1964 | 9,386,400 | 365,204 |
| 1965 | 5,177,500 | 201,533 |
| 1966 | 2,388,300 | 92,965 |
| 1967 | 143,000 | 5,560 |
| 1968 | 2,059,000 | 80,156 |
| 1969 | 1,914,000 | 74,482 |

As noted above, for Federal income tax purposes, Scott uses the accrual method of accounting and reports its income on a calendar year basis. For each taxable year, Scott deducted interest attributable to the debentures in an amount equal to that which had accrued daily on outstanding debentures. That is, with respect to debentures that were outstanding at the beginning of the year and that were not converted during the year, Scott deducted interest accrued for the period from January 1 through December 31; with respect to debentures that were converted during the taxable year, Scott deducted interest accrued for the period from January 1 through the date of conversion.

With respect to debentures converted between January 1 and February 28 of a given year, Scott employed a roundabout method of arriving at the amount of its interest deduction in the year of conversion. Because those debentures were outstanding at the close of Scott's prior taxable year, interest was accrued on them for the period September 1 through December 31 and was deducted from the income of that taxable year. However, it was Scott's practice to deduct in the year of conversion the interest accrued from the last interest payment date to the date of conversion. Because a deduction had been taken in that prior year for interest accrued from September 1 to December 31, Scott's practice duplicated, in the year of conversion, the deduction taken in the prior taxable year. To account for that duplication, Scott added back, in the year of conversion, an amount equal to the interest deduction taken in the prior year and attributable to the period September 1 to December 31. The net effect of this method was that Scott deducted an amount equal to the interest accrued on the debentures from January 1 to the date of conversion.

With respect to debentures converted at other times in the year, Scott's method of determining its interest deduction was straightforward. If a debenture were converted between March 1 and August 31, Scott would deduct as interest an amount equal to the interest accrued between January 1 and February 28 plus the interest accrued between March 1 and the date of conversion. If a debenture were converted between September 1 and December 31, Scott would deduct as interest an amount equal to the interest accrued between January 1 and February 28 plus the interest for the full interest period of March 1 through August 31 plus the interest accrued between September 1 and the date of conversion.

The following table sets forth for each taxable year in issue, and for all debentures converted in each of those taxable years, the amount of interest accrued from the previous interest payment date to the date of conversion.

| Taxable year | Interest accrued from prior interest payment date on all debentures converted |
|---|---|
| 1961 | $214,981 |
| 1962 | 32,990 |
| 1963 | 28,709 |
| 1964 | 46,686 |
| 1965 | 26,958 |
| 1966 | 30,130 |
| 1967 | 844 |
| 1968 | 12,099 |
| 1969 | 11,605 |

As explained above, the amount listed for each taxable year includes an amount of interest that accrued from September 1 to December 31 of the previous taxable year, which amount was deducted by Scott from income of that previous taxable year, on debentures that were converted between January 1 and February 28 of the listed taxable year. The following table sets forth for each taxable year in issue the amount of interest included in the preceding table that actually had accrued from September 1 of the previous taxable year to December 31 of the previous taxable year on debentures which were converted between January 1 and February 28 of the given taxable year.

| Taxable year | Interest accrued from Sept. 1 to Dec. 31 of prior taxable year on debentures converted between Jan. 1 and Feb. 28 |
|---|---|
| 1961 | $9,602 |
| 1962 | 11,606 |
| 1963 | 1,099 |
| 1964 | 9,983 |
| 1965 | 4,530 |
| 1966 | 8,111 |
| 1967 | 4 |
| 1968 | 23 |
| 1969 | 1,950 |

As explained above, the amounts depicted in the foregoing tables were effectively netted by Scott in its tax returns. The following table sets forth for each taxable year in issue the results of that netting process, i.e., the amount of interest for which a deduction was effectively claimed, which related to a debenture converted in the given year, and which had accrued from the later of two dates: the previous interest payment date or the beginning of the given taxable year.

| Taxable year | Effective interest deduction on converted debentures |
|---|---|
| 1961 | $205,379 |
| 1962 | 21,384 |
| 1963 | 27,610 |
| 1964 | 36,703 |
| 1965 | 22,428 |
| 1966 | 22,019 |
| 1967 | 840 |
| 1968 | 12,076 |
| 1969 | 9,655 |

Both the debentures and Scott's common stock were traded on the New York Stock Exchange. A holder could sell his debenture on the New York Stock Exchange or could convert his debenture to stock and sell the stock.[3] A holder who sold his debenture on the New York Stock Exchange would receive an amount representing the price of the debenture plus an amount representing the interest accrued on the debenture from the last interest payment date. A holder who converted his debenture

---

[3]Conversely, a potential investor in Scott common stock could buy the stock directly or could buy a debenture and convert it into common stock.

would receive the number of shares of Scott common stock determined under the indenture agreement.

For each of the taxable years 1961 through 1969, the Commissioner, in his statutory notice of deficiency, disallowed that portion of the interest deduction claimed by Scott in respect of the debentures equal to the amount of interest which accrued from the last interest payment date to the date of conversion for debentures which were converted during the taxable year. Alternatively, for the taxable years 1965 through 1969, the Commissioner added to Scott's income an amount representing income from the cancellation of indebtedness equal to the interest which accrued from the last interest payment date to the date of conversion for debentures which were converted during the taxable year. By an amendment to his answer in docket No. 1775–73, the Commissioner asserted the same alternative adjustment for the taxable years 1961 through 1964. The adjustments made by the Commissioner are equal in amount under either theory.

Interest accrued on debentures converted between interest payment dates was not paid by petitioner.

### Issue 2. Investment Credit and Depreciation

Scott is primarily engaged in the business of manufacturing and selling a variety of products, principally trademarked sanitary papers for home and industrial use. Scott owns and operates an integrated pulpmill and paper processing plant in Mobile, Ala. The mill and plant are situated at a facility that covers about 700 acres. Scott's entire operation in Mobile, Ala., including the mill and the plant, hereinafter will be referred to as the facility. The facility operates 24 hours per day, year round, with four exceptions. One- to three-day shutdowns normally occur at four holiday times, namely Independence Day, Labor Day, Thanksgiving, and Christmas. The shutdowns are used by Scott as times for maintenance and construction.

In 1964, Scott expanded the facility by installing a substantial amount of new machinery and equipment for the pulp and paper production processes, by building new structures, and by supplementing and modifying the electrical distribution system. Hereinafter, this will be referred to as the 1964 expansion. The following six divisions of the facility were affected by the 1964 expansion: (1) The pulpmill; (2) the fluff dryer; (3) the paper

machines; (4) the finishing process; (5) the waste treatment plant; and (6) the utilities system. In this case, we focus on the changes made in the electrical distribution system, which were extensive and related to operations in all of the foregoing six divisions.

The 1964 expansion was undertaken to increase the output capacity of the facility from 900 to 1,350 tons of paper per day. During the 1964 expansion, the facility operated normally except for 1- to 2-week shutdowns at Independence Day, Labor Day, and Christmas. The following paragraph outlines the operations carried out at the facility after the 1964 expansion.

Timber, which has been harvested from Scott's own land, or purchased, and which has been cut into specific lengths, is delivered to the wood handling and storage area of the pulpmill. The logs are transported in flumes from the storage area to mechanical conveyors. The flumes are manmade waterways in which the flow of water is maintained with pumps. The water in the flumes is strained constantly to remove grit and other debris that would impair the function of the flumes. Mechanical conveyors carry the logs into barking drums, which are huge, slotted, revolving drums that cause the bark to be removed from the logs. After the logs are debarked, they are conveyed to a chipper. Logs that are too thick to fit in the chipper are first processed in a log splitter. The chipper reduces the logs to thin wood chips which are approximately 1 inch square. The chips are conveyed to vibrating screens which isolate oversize chips. The oversize chips are put through a rechipper. All the processed chips are stored in chip silos until needed. When needed, the chips are conveyed to a digester into which chemicals known as liquors are fed. The liquors for the digester are stored and prepared in the liquor preparation department of the facility. Two types of digester processes are used at the facility. The first is batch digesting, in which the chips are cooked in batches under pressure with steam. The second is continuous digesting, in which the chips are cooked under pressure with steam in a continuous, automated process. These two processes remove the glue-like lignin from the chips, separate the wood fibers of the chips, and thus, create pulpstock. The pulpstock is washed to remove impurities and screened to remove knots and undispersed wood slivers. Each type of digester has its separate washing and screening facilities. After the washing and screen-

ing, the liquor is processed in evaporators and burned in recovery boilers to recover for reuse the chemicals used in the digesting process; the pulpstock is transported to a tile storage container. Then, the pulpstock is mixed with water and transported to a bleach plant. The pulpstock is subjected to a bleach-washing system that whitens the pulpstock. The chemicals used in the bleaching process are stored and prepared in the liquor preparation department of the facility. After bleaching and washing, the resulting pulp is pumped into bleached-pulp storage tanks. As required, the pulp is pumped from the storage tanks to paper machines which convert the pulp to paper by adding water, screening the mixture, rolling it, and drying it. The rolling and drying process causes the pulp fibers to dry together in a continuous sheet that is rolled up as paper. The rolled paper is taken to the finishing and converting department of the paper processing plant where it is cut, folded, and packaged into various consumer products. To the extent that the production of bleached pulp exceeded the capacity of the facility to make paper, a pulp dryer, also called a fluff dryer, was used at the facility to thicken, press, and dry the excess bleached pulp. The pulp dryer would also shred the resulting fiber, air-dry the fiber in towers heated with gas, and finally, bale the fiber. The baled fiber would be sent to other Scott facilities for use as pulp. This method of utilizing excess capacity at the facility was introduced during the 1964 expansion but was no longer used at the time of trial. Various wastes produced by the foregoing production process are treated at the facility. Utilities at the facility supply water, steam, and supplemental electrical power for the operation of the machinery, but the Alabama Power Co. supplies the bulk of the electrical power required for the production processes described above.

The following are buildings which existed at the facility after the 1964 expansion:

| Area | Building |
|---|---|
| Pulpmill | |
| (Wood handling and storage area) | Woodyard crane shed |
| Fluff dryer | Fluff dryer structure |
| Paper Machines | No. 1 paper machine structure |
| | No. 2 paper machine structure |
| | No. 4 paper machine structure |
| | No. 7 paper machine structure |
| | No. 8 paper machine structure |

Finishing department ..................... Finishing building
Waste treatment plant.................... Sludge filter structure

The following structures have no sides which enclose a space and do not meet the physical definition of a "building."

| Area | Structure |
|---|---|
| Pulpmill | |
| (Wood processing area).............. | Log sorting structure |
| (Liquor preparation area) .......... | "Assorted structures" |

The following structures either provide no working space for employees or only provide working space that is merely incidental to the principal function or use of the structure:

| Area | Structure |
|---|---|
| Pulpmill | |
| (Wood handling and storage area)... | (a) Substation structure |
| | (b) Substation structure |
| (Wood processing area)................ | Substation structure |
| (Digester, washing, and | |
| screening area)....................... | Traveling belt conveyor structure |
| Waste treatment plant.................... | Substation structure |
| 13.8-kV switchgear........................ | Switchgear structure |

The following structures house property used as an integral part of manufacturing or production and can be expected to be replaced at the same time as the machinery which they house:

| Area | Structure |
|---|---|
| Pulpmill | |
| (Wood processing area) ................ | Chipper structure |
| (Digester, washing, and screening | |
| area)................................... | (a) Continuous digester, knotting, washing and screening structure |
| | (b) Batch digester structure |
| (Liquor recovery and evaporator | |
| area)................................... | Recovery boiler structure |
| (Bleach plant) ........................... | (a) Bleach plant No. 1 structure |
| | (b) Bleach plant No. 2 structure |
| | (c) Bleach plant No. 3 structure |

Many of the operations described above utilize electrical power. The following is a general description of the flow of electricity at the facility. The Alabama Power Co. delivers 13.8 kV (kilovolt) power to Scott. This raw 13.8 kV power is handled by four main buses, or heavy copper bars, which are labeled R, S, T, and U. Each bus delivers 13.8 kV power to a group of feeders. The feeders on each bus are numerically designated. Those on R bus are feeders 103 through 119; those on S bus are feeders 120

through 135; those on T bus are feeders 138 through 146; and those on U bus are feeders 147 through 157. The feeders will be referred to hereinafter by their numerical designation with their corresponding bus designation as a prefix, e.g., R–103, S–120, T–138, U–147. Switchgear is located on each feeder. Switchgear is comprised of a high voltage breaker, a current transformer, meters, and relays. Physically, switchgear is housed in a metal cabinet, one cabinet per feeder. The switchgear for all feeders on a given bus are assembled in a row and resemble a bank of metal lockers. The copper bus bar runs the length of the bank of switchgear, providing power for each feeder. The 13.8 kV power leaves the switchgear via an interlock cable that carries power to several substations. Substations reduce the available electrical power from 13.8 kV either to 480 V (volts) or to 2,300 V. Substations are designated by their range of power capacity, which is expressed in kVA (kilovolt-amperes) and reflects the amount of electrical power that can be transmitted by the substation for ultimate consumption. Each substation is comprised of a primary disconnect switch, a transformer, a primary low-voltage breaker, a bus, meters, and distribution or secondary circuit breakers. The preceding portion of the electrical distribution system at the facility collectively will be referred to as the primary electric.

The reduced power provided by each substation flows through secondary cables to intermediate devices known as capacitors, reactors, motor control centers, and motor load centers. The secondary cables and the intermediate devices collectively will be referred to as the secondary electric. The capacitors and reactors are devices used to maintain and control the supply of power within the secondary electric. Both motor control centers (MCCs) and motor load centers (MLCs) are used to control the electrical devices that ultimately consume electrical power. The principal difference between MCCs and MLCs is the amount of voltage used. MCCs feed power to motors of 200 or more horsepower, whereas, MLCs feed power to motors of less than 200 horsepower. Finally, the electrical power that has been refined by the primary and secondary electric is consumed by electrical devices, such as motors, in the operation of the facility.

One-line diagrams for the entire primary and secondary electric are in existence. Such diagrams provide a figurative map tracing the flow of electricity at the facility from the introduc-

tion of power by the Alabama Power Co. through the primary and secondary electric to the devices that ultimately consume power. By reference to such diagrams, one may determine the identity of each device that ultimately consumes power. In addition to identifying such devices, the one-line diagrams indicate the amount of electrical load, expressed in kVA, that each such device places on the system. That is, the consumption of power at the facility is both traceable and measureable. Therefore, the electrical load on each of the components of the primary electric can be divided between the electrical load caused by machinery and equipment used to make pulp and paper (hereinafter electrical load due to process machinery) and other electrical load, such as that caused by power receptacles, lighting, heating, air conditioning, and other ventilation (hereinafter other electrical load).

In designing the electrical system for the facility, desired functions are first identified. Electrical devices necessary for such functions are then listed along with the amount of electrical load that each such device will place on the system. By adding up the loads needed to run the devices used to carry out the desired functions, the requirements for electrical power at the facility are determined. Unless the project under consideration were a building with many offices, the designer of the electrical system would not concern himself with the relatively slight power requirements of lighting and incidental electrical services such as wall sockets. The foregoing describes the method used by the designer in the instant case. In designing the primary electric system at the facility, a running total of the electrical load for each department was kept. A tentative plan was used to map out the electrical load due to process machinery. After determining the total electrical load due to process machinery for a given department, the number of substations needed for that department would be determined. In choosing substations to be used at the facility, two characteristics were of primary concern: (1) The incoming and outgoing voltages at the substation; and (2) the power capacity of the substation. No electrical load other than that of process machinery was taken into account in the design stage because the power demands of the process machinery at the facility were immense, and the other electrical load was negligible by comparison.

As noted above, the 1964 expansion included additions and

modifications to the electrical distribution system. Improvements to both the primary and secondary electric were made. Hereinafter, such improvements will be called, respectively, the primary electric improvements and the secondary electric improvements. Both the primary electric improvements and the secondary electric improvements are tangible property.

The additions to the electrical distribution system which were made during the 1964 expansion included the purchase and installation of cables, transformers, switchgear, breakers, meters, motor starters, and capacitors. Scott categorized work done during the 1964 expansion by job and assigned each of such categories a 5-digit job number. During the 1964 expansion, primary electric improvements were made to buses R, S, and T, and a new bus U was installed. Pertinent details of that work follow, organized primarily by bus and secondarily by feeder, with reference to the area of the facility affected and the job number to which the work was charged.

The primary electric improvements made during the 1964 expansion included improvements to R bus relating to the fluff dryer, the waste treatment plant, the utilities system, and the pulpmill. The fluff dryer was a new device installed during the 1964 expansion. On feeder R–118, Scott installed new cable and a new substation to service the fluff dryer. The total electrical load on this segment of feeder R–118 is 1,170 kVA, of which 94.4 percent is due to machinery. The remainder of the load is due to lighting and power receptacles. The work done on the fluff dryer was charged to job No. 31211.

A new waste treatment plant was added during the 1964 expansion. On feeder R–106, Scott installed new switchgear, cables, and two new substations. The total electrical load on feeder R–106 is 2,697 kVA, of which 92.8 percent is due to machinery. The remainder of the load is due to lighting and power receptacles. The work done on the waste treatment plant was charged to job Nos. 15200 and 15203.

The electrical utilities system at the facility is used to supplement the supply of power from the Alabama Power Co. During the 1964 expansion, a new steam turbine electrical generator was installed. In conjunction with that addition, Scott undertook primary electric improvements on feeder R–116, installing new switchgear, cables, and transformers. The total electrical load on feeder R–116 is 10,875.16 kVA, of which 91.4

percent is due to machinery. The remainder of the load is due to lighting, ventilation, and power receptacles. The work done on the utilities system was charged to job No. 31601.

Primary electric improvements were made to seven areas of the pulpmill: (1) The wood handling and storage area; (2) the wood processing area; (3) the digester, washing, and screening area; (4) the liquor recovery and evaporator area; (5) the liquor preparation area; (6) the bleach plant; and (7) the pulp storage and distribution area.

The wood handling and storage area is the area in which the logs are stored and from which they are conveyed by the flume and conveyors to the barking drums. During the 1964 expansion, Scott installed a new flume to carry logs, motors to drive the water, grit and stone collectors to clean the water, conveyors to transport logs, and lighting to illuminate the flume and woodyard. In connection with those installations and the relocation of a log splitter, Scott undertook primary electric improvements on feeder R–113, which mainly consisted of replacing cable. The total electrical load on feeder R–113 is 3,321 kVA, of which 98.3 percent is due to machinery. The remainder of the load is due to lighting and power receptacles. The work done in the wood handling and storage area was charged to job No. 15200.

The wood processing area encompasses conveyors, barking drums, sorting platforms, chippers, screens, and chip storage silos. During the 1964 expansion, Scott relocated an existing chipper and added a new barking drum, softwood chipper, screens, silo, hardwood chipper motor, and conveyors. In connection with those additions and changes, Scott carried out primary electric improvements on feeder R–108, which included adding and modifying switchgear, cable, and a substation. All of the electrical load on feeder R–108 is due to machinery. The work done in the wood processing area was charged to job No. 15200.

The digester, washing, and screening area is where wood chips are chemically processed into pulp and where the pulp is washed and screened. During the 1964 expansion, Scott added new washers, knotters, screens, and a continuous digester in this area. In connection with those additions, Scott made primary electric improvements on feeders R–107 and R–114. On feeder R–107, new switchgear, cables, and three substations were added. The total electrical load on feeder R–107 is 4,115.35 kVA, of which 94.5 percent is due to machinery. The remainder is due

to lighting, power receptacles, structural ventilation, and a manlift. On feeder R–114, Scott added new cable and a substation. All of the electrical load on feeder R–114 is due to machinery. The work done on feeders R–107 and R–114 was charged to job No. 15200.

The liquor recovery and evaporator area is the area where the chemicals that make pulp by digesting the wood chips are recovered for reuse by means of boilers and evaporators. During the 1964 expansion, Scott added a recovery boiler, an evaporator, and two liquor storage tanks. In connection with those additions, Scott made primary electric improvements on feeders R–104 and R–105, adding switchgear, cables, and substations. All of the electrical load on feeder R–104 is due to machinery. The total electrical load on feeder R–105 is 3,809.6 kVA, of which 87.4 percent is due to machinery. The remainder is due to ventilation, air conditioning, lighting, elevators, manlifts, and power receptacles. The work done on feeders R–104 and R–105 was charged to job No. 15200.

The liquor preparation area is the place where tanks, kilns, clarifiers, and mud washers are used to prepare the chemicals that are to be used in the digesters. During the 1964 expansion, Scott added a new kiln, a slaker, a mud washer, clarifiers, a lime unloading and storage system, pumps, and a storage tank. In connection with those additions, Scott made primary electric improvements on feeder R–111, installing a new substation and cables. The total electrical load on feeder R–111 is 5087.5 kVA, of which 86.1 percent is due to machinery. The remainder is due to heating, ventilation, air conditioning, lighting, manlift, and power receptacles. The work done on feeder R–111 was charged to job No. 15200.

The bleach plant contains five-stage bleach and washing systems which whiten the pulp. During the 1964 expansion, Scott added a new bleach plant and modified an old bleach plant. In connection with that work, Scott made primary electric improvements on feeders R–115, R–117, and R–118. On feeder R–115, Scott added new cable and a substation. The total electrical load on feeder R–115 is 5796.75 kVA, of which 99.2 percent is due to machinery. The remainder is due to heating, ventilation, air conditioning, manlift, and power receptacles. The work done on feeder R–115 was charged to job Nos. 15200 and 15239. On feeder R–117, Scott added cable and a substation. The

total load on feeder R–117 is 5,238 kVA, of which 97.7 percent is due to machinery. The remainder is due to heating, ventilation, air conditioning, lighting, manlift, and power receptacles. The work done on feeder R–117 was charged to job Nos. 15200 and 15257. On feeder R–118, Scott added new cable and substations. The total electrical load on feeder R–118 is 5,627.25 kVA, of which 93.7 percent is due to machinery. The remainder is due to heating, ventilation, air conditioning, lighting, elevator, and power receptacles. The work done on feeder R–118 was charged to job No. 15200.

The pulp storage and distribution area is the area where bleached pulp is stored in tanks and where pipes feed the pulp to the paper machines. During the 1964 expansion, Scott added new storage tanks and a new piping and distribution system. In connection with that work, Scott made primary electric improvements on feeder R–117, adding a new substation and cable. All of the electrical load related to pulp storage and distribution is due to machinery, but, as noted above, feeder R–117 also serves the bleach plant. The percentage of total electrical load on feeder R–117 that is due to machinery is summarized above in connection with improvements to the bleach plant. The work on feeder R–117 that related to the pulp storage and distribution area was charged to job No. 15200.

The primary electric improvements made during the 1964 expansion included improvements to S bus that related to paper machines Nos. 1 and 4. On feeder S–123, Scott installed new switchgear and cables to provide power to paper machine No. 4. The total electrical load on feeder S–123 is 10,591.75 kVA, of which 97.91 percent is due to machinery. The remainder of the load is due to lighting, ventilation, and power receptacles. The foregoing work was charged to job No. 15268; the following was charged to job No. 15266. On feeder S–125, Scott installed new switchgear and cables to provide power to paper machine No. 1. The total electrical load on feeder S–125 is 8,630.16 kVA, of which 99.91 percent is due to machinery. The remainder of the load is due to lighting.

The primary electric improvements made during the 1964 expansion included improvements to T bus that related to paper machine No. 2. On feeder T–140, Scott installed new cable and a new substation. The total electrical load on feeder T–140 is 1,029 kVA, of which 89.1 percent is due to machinery. The remainder of

the load is due to lighting, ventilation, and power receptacles. The foregoing work was charged to job No. 15234; the following was charged to job No. 15253. On feeder T–141, Scott installed new cable and a new substation. The total electrical load on feeder T–141 is 2,930 kVA, all of which is due to machinery.

The primary electric improvements made during the 1964 expansion included the addition of U bus to the electrical distribution system of the facility. This addition was required to accommodate the installation of two new paper machines, Nos. 7 and 8. Feeders U–151 and U–153 were added to service paper machine No. 7. On feeder U–151, Scott installed new switchgear, cables, and two substations. The total electrical load on feeder U–151 is 3,491.75 kVA, of which 90.49 percent is due to machinery. The remainder of the load is due to lighting, ventilation, and power receptacles. On feeder U–153, Scott installed new switchgear, cables, and a substation. The total electrical load on feeder U–153 is 4,550 kVA, all of which is due to machinery. Feeder U–152 was added to service the stock preparation and finishing processes of paper machines Nos. 7 and 8. On feeder U–152, Scott installed new switchgear, cables, and two substations. The total electrical load on feeder U–152 is 2,454.8 kVA, of which 71.6 percent is due to machinery. The remainder of the load is due to lighting, ventilation, and power receptacles. The foregoing work was charged to job No. 15201; the following was charged to job No. 15205. Feeders No. U–156 and U–157 were added to service paper machine No. 8. On feeder U–156, Scott installed new switchgear, cables, and two substations. The total electrical load on feeder U–156 is 2,280.35 kVA, of which 85.95 percent is due to machinery. The remainder of the load is due to lighting, ventilation, and power receptacles. On feeder U–157, Scott installed new switchgear, cables, and a substation. The total electrical load on feeder U–157 is 5,000 kVA, all of which is due to machinery.

Chart I on page 155 summarizes the power capacities of substations which were affected by the 1964 expansion.

CHART I

| Feeder No. | Substation No. | Power Capacity (kVA) | Feeder No. | Substation No. | Power Capacity (kVA) |
|---|---|---|---|---|---|
| R–104 | 27 | 3,750 | R–116 | B | 6,250 |
| R–105 | 28 | 1,500 | R–117 | 14 | 1,500 |
| R–105 | 29 | 1,500 | R–117 | 26A | 1,500 |
| R–106 | 23 | 1,500 | R–117 | 33 | 1,500 |
| R–106 | 40 | 1,000 | R–118 | 34 | 1,500 |
| R–107 | 31B | 1,500 | R–118 | 35A | 1,500 |
| R–107 | 31C | 1,500 | R–118 | 35B | 1,000 |
| R–107 | 32 | 1,000 | R–118 | 42 | 1,000 |
| R–108 | 30B | 3,750 | U–151 | 36B | 1,500 |
| R–110 | 1 | 1,500 | U–151 | 37 | 1,500 |
| R–110 | 5A | 1,000 | U–152 | 36E | 1,000 |
| R–110 | 5B | 1,000 | U–152 | 39 | 1,000 |
| R–110 | 6 | 1,000 | U–153 | 36A | 3,750 |
| R–111 | 7B | 1,000 | R–106 | 40 | 1,000 |
| R–111 | 7C | 1,000 | U–156 | 36D | 1,500 |
| R–111 | 8 | 1,000 | U–156 | 38 | 1,000 |
| R–111 | 30A | 1,000 | U–157 | 36C | 3,750 |
| R–113 | 7A | 3,750 | T–140 | 25B | 1,500 |
| R–113 | 15 | 1,500 | R–115 | 26B | 5,000 |
| R–114 | 31A | 2,500 | T–141 | 25A | 3,750 |
| R–115 | 26B | 6,250 | R–117 | 26A | 1,500 |
| R–115 | 3 | 1,500 | R–118 | 42 | 1,000 |

Chart II below summarizes the characteristics of the electrical load on the feeders which were affected by the 1964 expansion.

CHART II

| Feeder No. | Job No. | Total electrical load carried (kVA) | Part of total that is electrical load due to process machinery (Percent) | Part of total that is other electrical load (Percent) | (kVA) |
|---|---|---|---|---|---|
| R–104 | 15200 | 4,050.00 | 100.0 | 0 | 0 |
| R–105 | 15200 | 3,809.60 | 87.4 | 12.6 | 480.50 |
| R–106 | 15200 | | | | |
| | 15203 | 2,697.00 | 92.8 | 7.2 | 195.00 |
| R–107 | 15200 | 4,115.35 | 94.5 | 5.5 | 226.50 |
| R–108 | 15200 | 3,200.00 | 100.0 | 0 | 0 |
| R–111 | 15200 | 5,087.50 | 86.1 | 13.9 | 709.00 |
| R–113 | 15200 | 3,321.00 | 98.3 | 1.7 | 55.00 |
| R–114 | 15200 | 950.00 | 100.0 | 0 | 0 |
| R–115 | 15200 | | | | |
| | 15239 | 5,796.75 | 99.2 | 0.8 | 47.00 |
| R–116 | 31601 | 10,875.16 | 91.4 | 8.6 | 932.50 |
| R–117 | 15200 | | | | |
| | 15257 | 5,238.00 | 97.7 | 2.3 | 118.00 |
| R–118 | 15200 | | | | |

|        |       |           |       |      |        |
|--------|-------|-----------|-------|------|--------|
|        | 31211 | 5,627.25  | 93.7  | 6.3  | 353.75 |
| S–123  | 15268 | 10,591.75 | 97.9  | 2.1  | 221.50 |
| S–125  | 15266 | 8,630.16  | 99.9  | 0.1  | 7.50   |
| T–140  | 15234 | 1,029.00  | 89.1  | 10.9 | 112.50 |
| T–141  | 15253 | 2,930.00  | 100.0 | 0    | 0      |
| U–151  | 15201 | 3,491.75  | 90.5  | 9.5  | 332.17 |
| U–152  | 15201 | 2,454.80  | 71.6  | 28.4 | 696.90 |
| U–153  | 15201 | 4,550.00  | 100.0 | 0    | 0      |
| U–156  | 15205 | 2,280.35  | 85.9  | 14.1 | 320.42 |
| U–157  | 15205 | 5,000.00  | 100.0 | 0    | 0      |

"Other electrical load" as designated on the preceding chart includes these uses: (1) Yard lighting, (2) 440 V power receptacles used for functions such as welding, (3) air conditioning of primary electric, and (4) general services (other lighting, heating, ventilation, and air conditioning). Chart III below breaks down that "other electrical load" into such components.

CHART III
OTHER ELECTRICAL LOAD (kVA)

| Feeder No. | Yard lighting | 440V power receptacles | Air-conditioning of primary electric | General services | Total |
|------------|---------------|------------------------|--------------------------------------|------------------|-------|
| R–104 | 0 | 0 | 0 | 0 | 0 |
| R–105 | 0 | 270 | 50 | 160.50 | 480.50 |
| R–106 | 105 | 90 | 0 | 0 | 195.00 |
| R–107 | 0 | 90 | 45 | 91.50 | 226.50 |
| R–108 | 0 | 0 | 0 | 0 | 0 |
| R–111 | 197.5 | 450 | 29.5 | 32.00 | 709.00 |
| R–113 | 25 | 30 | 0 | 0 | 55.00 |
| R–114 | 0 | 0 | 0 | 0 | 0 |
| R–115 | 0 | 30 | 15 | 2.00 | 47.00 |
| R–116 | 0 | 90 | 30 | 812.50 | 932.50 |
| R–117 | 0 | 60 | 15 | 43.00 | 118.00 |
| R–118 | 0 | 90 | 60 | 203.75 | 353.75 |
| S–123 | 0 | 30 | 10 | 181.50 | 221.50 |
| S–125 | 0 | 0 | 0 | 7.50 | 7.50 |
| T–140 | 0 | 0 | 10 | 102.50 | 112.50 |
| T–141 | 0 | 0 | 0 | 0 | 0 |
| U–151, 152 | 0 | 210 | 0 | 819.07 | 1,029.07 |
| U–153 | 0 | 0 | 0 | 0 | 0 |
| U–156 | 0 | 60 | 220 | 40.42 | 320.42 |
| U–157 | 0 | 0 | 0 | 0 | 0 |

The electrical distribution system, including both primary and secondary electric, requires air conditioning and an enclosed environment to protect the switchgear, substations, MCCs, MLCs, capacitors, and reactors from heat, corrosive fumes, and discharges from the pulp- and paper-making processes at the facility. Except for cables and certain specially constructed outdoor equipment, the components of the electrical distribution

system are located within specially prepared rooms or structures which are used to provide such a controlled environment. The cables generally are located in outdoor and indoor overhead trays, but some are buried. Cables are merely laid in place and are readily removable. The switchgear and substations are bolted or tack-welded to metal channels which are embedded in the floor. The switchgear and substations are removable from the channels by simply removing the bolts or burning off the tack welds. The switchgear and substations are removable from their enclosures through double doors or knockout panels which are designed for that purpose. Primary electric components can be moved without being damaged or functionally impaired. During the 1964 expansion, three substations were moved to make room for a new boiler house. Two months of preparatory work were followed by a 48-hour period in which the substations were disconnected, moved, and reconnected. There is no unique characteristic about any component of the primary electric that would prevent it from being put to use on another circuit having similar power requirements. For example, idle breakers from the primary electric which had served the fluff dryer were pressed into service on another circuit when the need arose.

For Federal income tax purposes, Scott treated the primary electric improvements as section 38 property, claiming an investment credit for those improvements. Scott also claimed deductions for depreciation of the primary electric improvements, using a 16-year guideline life. The Commissioner, in his statutory notice of deficiency, determined that the primary electric improvements did not qualify as section 38 property and disallowed Scott's investment credit to the extent that it was derived from the primary electric improvements. Because of that determination, the Commissioner denied Scott the use of a 16-year guideline life for depreciation of the primary electric improvements and instead imposed upon them the 45-year guideline life used for buildings, which resulted in decreased deductions for depreciation.

The electrical distribution system at the facility in Mobile, Ala., was improved further in 1968. Also in 1968, Scott improved the electrical distribution system at its paper processing plant in Chester, Pa. In 1969, Scott improved the electrical distribution system at its paper processing plant in Fort Edward, N.Y. These improvements made in 1968 and 1969 were of the same nature as

those undertaken in 1964 at the Mobile facility, and Scott, likewise, claimed investment credits and deductions for depreciation on account of the improvements made in 1968 and 1969. The Commissioner's determinations as to the improvements made in 1968 and 1969 were the same as his determination as to the similar improvements made in 1964. Since Scott's improvements and claims and respondent's determinations thereto for 1964, 1968, and 1969 are virtually identical, the parties have agreed to resolve the investment credit and depreciation issues stemming from Scott's improvements to electrical distribution systems in 1968 and 1969 according to our resolution of the same issues in connection with the similar improvements made by Scott in 1964 at the facility in Mobile, Ala. Such resolution will be given effect under the computation made in these consolidated cases under Rule 155, Tax Court Rules of Practice and Procedure. Accordingly, the record and findings of fact herein have been limited to the improvements made in 1964 at the facility in Mobile, Ala.

## OPINION

### Issue 1. Interest on Debentures

During all of the taxable years in issue, debentures issued by Scott were outstanding, bearing interest at 3 percent, payable semiannually, and convertible at face value into shares of Scott common stock valued at a price fixed by the indenture agreement. When a debenture was converted, the holder who was converting his debenture surrendered the debenture and the unmatured interest coupons attached to the debenture. He received, in exchange, whole shares of Scott common stock and cash or scrip in lieu of fractional shares. With respect to debentures which were converted during a given taxable year and not on an interest payment date, Scott deducted as interest expenses under section 163 not only the amount of interest accrued in that year for completed interest periods, but also the amount of interest accrued during the incomplete interest period, i.e., the period from the later of the previous interest payment date or the beginning of the given taxable year to the date of conversion.

The Commissioner made alternative adjustments on two

theories: nonpayment of interest for the incomplete interest period and cancellation of indebtedness.

Scott argues that the interest accrued on its convertible debentures during the incomplete interest period was paid in stock at the time of conversion. Scott contends that, because of the trading practice regarding its debentures, each debenture holder who converted a debenture to stock elected to receive his accured interest in stock (by converting) rather than in cash (by selling the debenture on the New York Stock Exchange). To support this contention, Scott portrays a pattern of conversions showing that stock, rather than cash, was taken in payment for the principal and accrued interest on the debentures when the stock had a fair market value in excess of the value of the debentures plus their accrued interest.

The foregoing argument addresses both of respondent's alternative adjustments. Under that argument, the interest on the converted debentures was not only properly accrued but was also paid and, thus, the deduction for interest was properly claimed. Also, if the accrued interest on the converted debentures were fully paid in stock, then the interest indebtedness was not canceled or forgiven, and no income would arise from cancellation of indebtedness.

Alternatively, Scott argues that, if the accrued interest on the debentures were not paid in stock when the debentures were converted, to the extent that the surrender of unmatured interest coupons was a cancellation of indebtedness, a nontaxable contribution to capital under section 118 resulted.

Petitioner and respondent both have cited cases to support their respective contentions that the conversion of debentures did or did not result in payment of the interest accrued on the converted debentures from the previous interest payment date. Whether or not such payment resulted is a question of fact. See *Capento Securities Corp. v. Commissioner*, 47 B.T.A. 691 (1942), affd. 140 F.2d 382 (1st Cir. 1944); *Hummel-Ross Fibre Corp. v. Commissioner*, 40 B.T.A. 821 (1939). Specifically, the question is whether the stock transferred by Scott was transferred as consideration for the converted debentures plus the amount of interest accrued thereon, or only for the converted debentures. Compare *Hummel-Ross Fibre Corp. v. Commissioner, supra, Shamrock Oil & Gas Co. v. Commissioner*, 42 B.T.A. 1016 (1940), and *Central Electric & Telephone Co. v. Commissioner*, 47 B.T.A.

434 (1942), with *Columbia Gas System, Inc. v. United States*, 473 F.2d 1244 (2d Cir. 1973), affg. 334 F. Supp. 1279 (S.D. N.Y. 1971), *Bethlehem Steel Corp. v. United States*, 193 Ct. Cl. 459, 434 F.2d 1357 (1970), *Capento Securities Corp. v. Commissioner, supra,* and *Tandy Corp. v. United States,* an unreported case (N.D. Tex. 1979, 43 AFTR 2d 79–694, 79–1 USTC par. 9160).

Petitioner contends that the facts of this case are analogous to those of *Hummel-Ross Fibre Corp. v. Commissioner, supra, Shamrock Oil & Gas Corp. v. Commissioner, supra,* and *Central Electric & Telephone Co. v. Commissioner, supra.* We disagree. In the *Hummel-Ross Fibre Corp.* case, pursuant to a statutory plan of reorganization adopted on March 16, 1934, and ratified on April 6, 1934, the corporate taxpayer exchanged preferred stock, which carried cumulative dividends from January 1, 1934, to the date of exchange, for outstanding second mortgage bonds, on which interest had accrued from January 1, 1934, to the date of exchange. In the *Shamrock Oil & Gas Co.* case, pursuant to a statutory plan of reorganization adopted on July 9, 1935, and ratified on July 24, 1935, the corporate taxpayer exchanged stock and bonds of a new corporation for outstanding bonds with attached interest coupons reflecting interest accrued from March 1, 1933, to the date of exchange, September 1, 1935. In the *Central Electric & Telephone Co.* case, pursuant to a plan of reorganization entered into during bankruptcy proceedings, the corporate taxpayer exchanged new mortgage bonds, preferred stock, common stock, and cash for outstanding bonds with interest accrued from January 1, 1934, to February 29, 1936. In each of these cases, the Board of Tax Appeals found that the accrued interest on the outstanding debentures was paid when the exchange occurred.

The terms of the exchanges that were carried out in the three cases discussed above were the subject of contemporaneous bargaining between the parties, and the Board of Tax Appeals was able to find as a fact that, pursuant to the exchanges carried out in those cases, the accrued interest actually was paid. In the instant case, the terms of conversion were established when the debentures were issued, and such terms remained unchanged for the taxable years in issue here. The terms of exchange here do not explicitly call for the payment of accrued interest. In the face of such uncertainty, Scott must prove that the conversion of debentures into common stock resulted in the payment of

accrued interest by Scott. The determinations in the three cases discussed above were factual, and the determination here is factual. Petitioner has not convinced this Court that it would be appropriate to make a factual determination here that is similar to the determination in the *Hummel-Ross Fibre Corp., Shamrock Oil & Gas Corp.,* and *Central Electric & Telephone Co.* cases. Instead, we find the facts here to be sufficiently similar to those in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases to call for a result similar to that reached in those cases.

In *Bethlehem Steel Corp. v. United States, supra,* the indenture contained the following language: "No adjustment shall be made for interest accrued on any Debenture that shall be converted or for dividends on any Common Stock that shall be issuable upon the conversion of such Debenture." (434 F.2d at 1358.) In *Columbia Gas System, Inc. v. United States, supra,* the indenture provided that: "There shall be no adjustments in respect of interest or dividends on the conversion of any Debenture or Debentures." (473 F.2d at 1246.) In that same case, the debentures themselves provided that: "No adjustment is to be made on conversion for interest accrued hereon or for dividends on securities issued on conversion." (473 F.2d at 1246.)

In both the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases, the courts recognized that the "no adjustment" clauses involved in those cases were subject to two interpretations which were plausible and opposite. In both cases, the courts construed the ambiguity of interpretation against the drafter of the "no adjustment" language. The courts decided that the proper interpretation was that stock was being exchanged for the debentures, and that the interest accrued on the debentures was being canceled, forfeited, or forgiven rather than stock being exchanged for both the debentures and the interest accrued on them.

Here, as in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases, the terms of the conversion were fixed in the debenture certificates and indenture agreement. The provision as to accrued interest in the debenture certificate here is almost identical to that found in the indenture involved in the *Bethlehem Steel Corp.* case and is as follows: "No adjustment or payment is to be made on conversion for interest accrued hereon or for dividends on securities issued on conversion." In the indenture agreement involved in this case it is further provided

that: "No adjustment or payment shall be made for interest accrued on any Debenture that shall be converted or for dividends on any Common Share that shall be issued upon the conversion of such Debenture."

The ambiguity of the "no adjustment" clauses under scrutiny in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases is also apparent in the instant case, especially in light of the following language from the debenture certificate concerning payment of interest: "Scott Paper Company * * * hereby promises * * * to pay interest * * * only upon presentation and surrender of the coupons for such interest installments hereto attached *as they severally mature.*" (Emphasis added.) Correspondingly, the indenture agreement provides as follows: "The interest on the coupon Debentures becoming payable on or prior to the maturity of the Debentures shall be payable only upon presentation and surrender of the several coupons for such interest installments as are evidenced thereby and as such coupons mature." (Emphasis added.) The foregoing language governing the payment of interest can be interpreted as meaning that the interest becomes payable only when the maturity date of a debenture coupon occurs, or, when a coupon is presented and surrendered, the interest becomes payable to the extent that it has accrued. These interpretations are equally plausible.

In addition to considering the language of the indenture and debentures, the courts in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases took into account the facts and circumstances surrounding the exchange of stock for debentures. The courts compared those exchanges to the exchanges found in *Hummel-Ross Fibre Corp. v. Commissioner, supra; Shamrock Oil & Gas Corp. v. Commissioner, supra; Central Electric & Telephone Co. v. Commissioner, supra;* and *Capento Securities Corp. v. Commissioner, supra.* On the basis of that comparison, the courts found that the exchanges in the four Board of Tax Appeals cases were ones in which bargains were struck near the time of the exchanges, whereas, in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases, the terms of the exchanges were fixed in the indentures and debentures. By being fixed, the terms did not reflect fluctuations in the value of the stock, the value of the debentures, or the amount of interest accrued on the debentures. That, in turn, gave credence

to interpreting the "no adjustment" language of the debentures and indentures as meaning that stock was being exchanged for debentures, and the interest on the debentures was being canceled, forfeited, or forgiven.

Having examined all of the facts and circumstances surrounding conversion of the debentures herein, we find them similar to those present in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases. Those cases apply the principles established by the Board of Tax Appeals in *Hummel-Ross Fibre Corp.*, *Shamrock Oil & Gas Corp.*, *Central Electric & Telephone Co.*, and *Capento Securities Corp.* After examining the facts and circumstances surrounding the conversion of the debentures herein and adopting reasoning analogous to that employed in the *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.* cases, we have found as a fact that the accrued interest on the debentures converted between interest paying dates was not paid.

As was the case in *Bethlehem Steel Corp.* and *Columbia Gas System, Inc.*, petitioner, here, has not come forward with sufficient proof to negate the ambiguity of the provisions of the debenture certificates and indenture agreement and to establish that the accrued interest was, in fact, paid. The only facts adduced by petitioner to prove that it provided for the payment of interest were those which were presented to show a pattern of conversion which was related to the price of debentures and stock on the New York Stock Exchange. That is, during the periods of most frequent conversion, the market price of the Scott stock exceeded the sum of the market price of the debentures plus the interest accrued on the debentures.[4] Under such facts, a converting debenture holder would receive stock with a market value in excess of the market value of the debentures plus accrued interest. Asking us to recognize the economic reality of exchanges made under such facts, petitioner argues that the interest accrued on the debentures was paid upon conversion. To so conclude, ignores a plain fact of conversion. Under the terms of conversion, the same amount of stock is received for a converted debenture on the first day of a

[4]Petitioner has not claimed that all conversions took place under such facts. Conceivably, some conversions might have taken place in the absence of such economically attractive conditions. Such conversions would not support petitioner's argument that the interest was paid.

new interest period, when only 1 day of interest has accrued, as is received on the day before an interest payment, when almost 6 months of interest has accrued. Also, it is a cardinal rule of tax law that we look to the transaction which actually occurred to determine its tax consequences. Although one might convert a debenture only when the value of stock received on conversion equals or exceeds the market value of the debenture plus accrued interest, it does not necessarily follow that the tax effect of conversion and sale must be identical. As stated by the Supreme Court in *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134 (1974):

This Court has observed repeatedly that, while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, *Higgins v. Smith*, 308 U.S. 473, 477 * * * ; *Old Mission Portland Cement Co. v. Helvering*, 293 U.S. 289, 293 * * * ; *Gregory v. Helvering*, 293 U.S. 465, 469 * * * , and may not enjoy the benefit of some other route he might have chosen to follow but did not. [417 U.S. at 149.]

The actual conversion transaction did not provide for the payment of accrued interest. The sale of the debentures on the open market did. That it was more economically attractive to convert the debenture into stock than to sell the debenture and receive cash equivalent to its market value plus interest does not change the tax result of the conversion transaction. In sum, the pattern of conversion depicted by petitioner does not convince us that the accrued interest was paid. Having taken into account all of the facts and circumstances of the instant case, we have found as a fact that the accrued interest indebtedness on the debentures was not paid when the debentures were converted.[5]

Petitioner reports its income on the basis of a calendar year and uses the accrual method of accounting. The debentures are a form of indebtedness on which interest accrues. Section 163(a) provides that a deduction is allowed for all interest accrued within the taxable year on indebtedness. Interest is an expense that usually accrues ratably over an elapsed period of time.

---

[5]Petitioner's argument by analogy to the deduction of unamortized original issue bond discount does not support the proposition that the accrued interest was paid. If a bond is issued at a discount and later converted, and the value of the bond for purposes of conversion is equal to the face amount of the bond, then the holder has in fact received a tangible economic benefit equal to the amount of the discount because the holder paid less than face amount for the bond yet received an amount of stock equivalent to the face amount of the bond on conversion.

*Miller & Vidor Lumber Co. v. Commissioner*, 15 B.T.A. 948 (1929), affd. 39 F.2d 890 (5th Cir. 1930), cert. denied 282 U.S. 864 (1930); *Cumberland Glass Mfg. Co. v. Commissioner*, 2 B.T.A. 1122 (1925). For a taxpayer on the accrual method of accounting, however, an item is deductible only when all the events have occurred which fix the amount of the item and which determine the liability of the taxpayer to pay the item. *United States v. Anderson*, 269 U.S. 422 (1926); *Dixie Pine Products Co. v. Commissioner*, 320 U.S. 516 (1944). If the liability of the taxpayer is merely contingent, rather than fixed, then an item of expense, e.g., interest, is not accruable for tax purposes. *Security Flour Mills Co. v. Commissioner*, 321 U.S. 281 (1944); *American Bemberg Corp. v. United States*, 253 F.2d 691 (3d Cir. 1958), affg. 150 F. Supp. 355 (D. Del. 1957), cert. denied 358 U.S. 827 (1958); *Carlisle Tire & Rubber Co. v. Commissioner*, 168 F.2d 816 (3d Cir. 1948), affg. a Memorandum Opinion of this Court; *Peoples Bank & Trust Co. v. Commissioner*, 50 T.C. 750 (1968), affd. 415 F.2d 1341 (7th Cir. 1969). Such is the case here.

Under the terms of the debenture certificate and the indenture agreement, petitioner was not required to, and did not, pay interest on converted debentures for the period from the prior interest payment date to the date of conversion. Thus, the liability of Scott to pay interest became fixed only on interest payment dates. Scott could not ascertain with any reasonable amount of certainty the number of debentures that would be converted prior to an interest payment date. Indeed, as detailed in our findings of fact, debentures aggregating over $83 million were converted during the taxable years before us. As a result, the amount of interest for which Scott was liable was not ascertainable until the interest payment date. Since neither the fact nor the amount of petitioner's liability for interest was fixed prior to the arrival of an interest payment date, it was improper to accrue and deduct the unpaid interest on debentures which were converted during the taxable years in issue.

Likewise, it was improper to accrue and deduct interest for the period September 1 to December 31 on debentures which remained unconverted on December 31 of a given taxable year, because Scott's liability to pay interest would not be fixed and determinable until March 1 of the following year. However, no part of respondent's deficiency was based on disallowing the accrual and deduction of interest from September 1 through

December 31 on debentures that remained unconverted through March 1 of the following year, even though such accrual and deduction was improper, and the deduction should have been taken in the year of payment. The entire deficiency related to the debenture interest issue was based on disallowing the accrual and deduction of interest which was not paid because of conversion. In other words, respondent reduced the magnitude of the claimed deductions, but did not challenge their timing. Compare Rev. Rul. 74–127, 1974–1 C.B. 47 with Rev. Rul. 68–170, 1968–1 C.B. 71.

Our holding is, therefore, contrary to the adjustments made by the Commissioner in his statutory notice of deficiency. Under our holding, petitioner is entitled to deduct, under the accrual method of accounting, only interest due on March 1 and September 1 of each year on convertible debentures which Scott paid on those dates. The parties are directed under Rule 155, Tax Court Rules of Practice and Procedure, to recompute petitioner's tax liabilities for each of the years involved in accordance with our holding, but the deficiency for any given year so computed cannot exceed the deficiencies determined by the Commissioner in his statutory notices of deficiency because he has not pleaded and prayed for increased deficiencies.

## *Issue 2. Investment Credit and Depreciation*

As described previously, the facility in Mobile, Ala., was expanded in 1964 in order to increase its output capacity from 900 to 1,350 tons of paper per day. Scott installed primary electric improvements and secondary electric improvements, added new machinery and equipment used to make pulp and paper, and built new structures. The primary electric improvements affected the electrical system in six divisions of the facility, namely the pulpmill, the fluff dryer, the paper machines, the finishing process, the waste treatment plant, and the utilities system. Here, qualification for the investment credit is sought for the primary electric improvements.

The primary electric and the secondary electric operate together, distributing power received from the Alabama Power Co. to devices which ultimately consume power. The function of the primary electric is to accept raw electrical power from the Alabama Power Co. channel that power into four separate buses and their respective feeders, provide circuit breakers on each

feeder to minimize any damage from short circuits, and provide substations on each feeder to reduce voltage to a level suitable for consumption. The function of the secondary electric is to deliver the reduced power via cable and control mechanisms to devices which ultimately consume power, e.g., motors.

The electrical power that flows through the primary and secondary electric is easily traceable, and the consumption of electrical power by devices at the facility is objectively measureable. By so tracing and measuring the use of power, it was shown above that the electrical power on most feeders is used primarily for running process machinery. The Commissioner used such a method in determining the extent to which the secondary electric improvements qualified for the investment credit. That is, he allowed Scott an investment credit for secondary electric improvements to the extent that the secondary electric carried power to be used for Scott's pulp and papermaking processes. Correspondingly, he disallowed the investment credit insofar as the secondary electric carried power to be used for lighting within buildings, for ventilation not essential to process functions, and for other purposes associated with providing building services rather than productive capacity. The Commissioner made the foregoing allocation on the basis of the percentage of electrical load consumed by each category of use, applying such percentage to the cost of the secondary electric improvements. Although his allocations by reference to the load carried by the secondary electric are not in issue here, it is consistent with the intent of Congress to provide an incentive for capital expenditures which improve production processes, but not to provide an incentive for capital expenditures which improve buildings housing such processes.

The investment credit became part of the Internal Revenue Code following passage of the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 967 (1962). The stated purpose of the investment credit is to increase the productivity and output of American business, thus bringing about an increased rate of economic growth. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 411–413; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707–708, 717–718. Toward that end, the investment credit is a tax incentive given those who make capital expenditures which modernize production processes. An examination of the legislative history behind this incentive discloses that

Congress intended to reward the purchase of machinery, equipment, and other miscellaneous property which is used to turn out a product or run a business, but not to reward the purchase or improvement of property used for simply providing a work place, e.g., a building, in which such machinery and equipment would be used. See *Central Citrus Co. v. Commissioner*, 58 T.C. 365, 374 (1972). "The credit is available for investments in most tangible personal property. It also is available for limited types of real property, other than buildings. The greater emphasis is placed on equipment and machinery because it is believed the need for such investment is the major requirement of the economy." H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 413. Consistent with such statement are the explanations by the committees of what qualifies as section 38 property. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 415–416; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 722–723.

The dispute herein is whether components of the primary electric that were added in the 1964 expansion of the facility qualify under section 48(a)(1) as section 38 property. To the extent that such components, which collectively are referred to as the primary electric improvements, qualify as section 38 property, they are qualified investments under section 46(c) and are included when calculating under section 46(a) the amount of investment credit allowable to Scott under section 38. Conversely, to the extent that the primary electric improvements do not qualify as section 38 property, a commensurate part of the investment credit claimed by Scott is not allowable.

Section 48(a)(1), which describes property that qualifies as section 38 property, provides in pertinent part as follows:

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services,

\*      \*      \*      \*      \*      \*      \*

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life

(determined as of the time such property is placed in service) of 3 years or more.

The only question for our decision is whether the primary electric improvements are property described by subparagraph (A) or (B)(i) of section 48(a)(1).[6] Subparagraphs (A) and (B)(i) do not contain very precise definitions of property which qualify as section 38 property, but under section 38(b), Congress explicitly empowered the Secretary of the Treasury or his delegate to prescribe regulations governing sections 38, 46, 47, 48, 49, and 50. Regulations were promulgated pursuant to that authority, distinguishing among tangible personal property, other tangible property that is section 38 property, and other tangible property that is not section 38 property. The criteria used in those regulations to explain subparagraphs (A) and (B)(i) of section 48(a)(1) are consistent with the approach taken in the legislative history behind section 48(a)(1). Compare sec. 1.48–1(c), (d), and (e), Income Tax Regs., with H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 405, 415–416, and S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 722.

All tangible personal property qualifies under section 48(a)(1)(A) as section 38 property. Qualified tangible personal property is defined by excepting certain types of tangible property from the broad category of tangible personal property. Section 1.48–1(c), Income Tax Regs., provides in part as follows:

For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property.[7]

---

[6]The exceptions to the general rule which are alluded to in sec. 48(a)(1) are inapplicable here. Depreciation is allowable with respect to the primary electric improvements. They have an estimated useful life in excess of 8 years. No contention has been made that the primary electric improvements are described by sec. 48(a)(1)(c); likewise, no contention has been made that either clause (ii) or clause (iii) of sec. 48(a)(1)(B) is relevant to the inquiry herein.

[7]The section then specifically includes certain kinds of property as being tangible personal property:

"Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section

In deciding whether the primary electric qualifies under that definition as tangible personal property, there are two points of contention between the parties:

(1) Whether the primary electric improvements are in the nature of "inherently permanent structures," and

(2) Whether the primary electric improvements are structural components.

With respect to the latter point of contention, it is also necessary to decide whether certain structures at the facility are buildings.

In the course of deciding whether the primary electric system, including the primary electric improvements, is an inherently permanent structure, six basic questions must be asked and answered. *Whiteco Industries, Inc. v. Commissioner*, 65 T.C. 664 (1975). The questions, as formulated in *Whiteco Industries* and the answers mandated by the facts herein, are as follows:

(1) "What is the manner of affixation of the property to the land? *Joseph B. Weirick*, [62 T.C. 446 (1974)]; *C. C. Everhart*, [61 T.C. 328 (1973)]; *Beverly R. Roberts*, [60 T.C. 861 (1973)]." *Whiteco Industries, Inc. v. Commissioner, supra* at 673. The substations and switchgear are bolted or tack-welded to the floor. Those methods of affixation anchor the devices firmly, but allow the substations and switchgear to be moved readily. The bolts need only be removed; the tack welds need only be burned off. Neither method of affixation is too permanent. As for the cables, all but the few which are buried are simply laid in overhead trays.

(2) "Is the property capable of being moved, and has it in fact been moved? *Alabama Displays, Inc. v. United States*, [205 Ct. Cl. 716 (1974)] 507 F.2d [844] at 849; *Joseph Henry Moore*, 58 T.C. 1045, 1052 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973)." *Whiteco Industries, Inc. v. Commissioner, supra* at 672. The testimony given at trial convinces us that the primary electric

---

38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property. [Sec. 1.48–1(c), Income Tax Regs.]"

Note also that local law does not determine whether or not property is personal or tangible. Sec. 1.48–1(c), Income Tax Regs.

components, including the primary electric improvements, are movable and have been moved. By removing bolts or burning off tack welds, the substations and the switchgear are rendered movable. Cables which are laid in trays need only be lifted out of those trays; cables which are buried must be unearthed or pulled from underground housings. Three substations at the facility were actually moved during 1964; those moves also required the relocation of some cables.

(3) "Is the property designed or constructed to remain permanently in place? *Joseph B. Weirick*, [*supra* at 451]; *C. C. Everhart*, [*supra* at 330]; *Beverly R. Roberts*, [*supra* at 866]." *Whiteco Industries, Inc. v. Commissioner, supra* at 672. The components of the primary electric are adaptable to tasks other than those in which they are employed. If some components are idled, they may be used elsewhere if the specifications of the components meet the requirements of the new job. For example, a substation could be moved to another site to perform its voltage reduction function as long as the load range of the substation was compatible with the new load demands to be placed on it. Similarly, cable could be moved and adapted to new uses if it had the proper number of conductors, insulation rating, and kind of encasement.

(4) "Are there circumstances which tend to show the expected or intended length of affixation, i.e., are there circumstances which show that the property may or will have to be moved? *Alabama Displays, Inc. v. United States, supra; Kenneth D. LaCroix*, 61 T.C. [471] at 487 [(1974)]." *Whiteco Industries, Inc. v. Commissioner, supra* at 672. It appears that the primary electric system will remain in place as long as it serves the function for which it was designed. When new requirements for power arise, such as the 1964 expansion, the primary electric equipment will be moved and modified to accommodate the new demands of the facility.

(5) "How substantial a job is removal of the property and how time-consuming is it? Is it 'readily removable'? *Estate of Shirley Morgan*, 52 T.C. [478] at 483 [(1969), affd. per curiam 448 F.2d 1397 (9th Cir. 1971)]." *Whiteco Industries, Inc. v. Commissioner, supra* at 673. Several large outdoor transformers were moved during the 1964 expansion. That job took 48 hours and included disconnecting, moving, and reconnecting the transformers. Other components of the primary electric are more easily

movable. Substation and switchgear enclosures provide doors or knockout panels to allow removal of substations and switchgear. Most cables need only be lifted from their trays. On the whole, the primary electric components are "readily removable."

(6) "How much damage will the property sustain upon its removal? *King Radio Corp. v. United States*, 486 F.2d 1091, 1096 (10th Cir. 1973)." *Whiteco Industries, Inc. v. Commissioner*, *supra* at 673. In this case, the components of the primary electric would remain intact and reusable upon their removal.

Based upon the answers to the foregoing questions, we have concluded that the components of the primary electric system are not "inherently permanent structures." In so concluding, we feel compelled to address specifically respondent's two most serious contentions to the contrary.

First, respondent points out that although it took 48 hours to move the large outdoor transformers, 2 months were spent in preparation for that move. The 1964 expansion was executed in such a way that only three shutdowns of 1 to 3 weeks each were necessitated. In order to minimize the disruption of production, extensive preparation was undertaken by Scott prior to the shutdowns. Because of that preparation, the transformers were moved and reconnected within 48 hours of being disconnected. We are convinced that the 48-hour time requirement for relocating the large transformers is not misleading. It did take that long to *move* the transformers. Whether it would have taken longer than 48 hours to make them *operational* had the preparatory work not been done is irrelevant to the issue of movability.

Second, respondent notes that the primary electric components which were used for the fluff dryer remained in place after the fluff dryer was removed. Respondent thus concludes that the primary electric was intended to be left permanently in place. Part of the fluff dryer substation, namely the low voltage breakers, had been removed for use elsewhere by the time of trial. Had petitioner found another use for any other part of the primary electric which had been associated with the fluff dryer, we are convinced that it, too, would have been so employed. In short, the evidence contradicts respondent's assertion.

Respondent's contention that the primary electric improvements are structural components is multifaceted. Respondent notes that the facility encompasses more than a single building

or a single area, that the overall function of the facility is to make paper products, and that the primary electric serves the entire facility. Respondent contends that the primary electric is a central system of the entire facility and that, whether located in, on, or adjacent to a building, the primary electric is a structural component of the facility, being analogous to the examples of structural components used in the regulations, namely, a central air-conditioning system, a central heating system, plumbing and plumbing fixtures, and electrical wiring. Respondent goes on to say that no distinction should be made between the basic wiring system of a single building and the basic wiring system of an overall processing operation which is spread out over an entire production site. Respondent views the entire primary electric at the facility as such a basic wiring system and distinguishes it from the secondary electric because respondent considers the secondary electric to be identifiable with specific electrical devices. One of the reasons that respondent does not consider the primary electric to be identifiable with specific electrical devices is that in certain instances, components of the primary electric, which delivered electrical power for a given device, remained useful and adaptable to further uses after that device was no longer in use. Since respondent believes that the primary electric is not directly connected with devices which consume electrical power, he argues that it would be improper to use the allocation of electrical load among ultimate uses to identify a portion of the primary electric improvements as tangible personal property.

Respondent asks us to view the facility as a whole, the entire primary electric as a system that services that whole, and the entire primary electric as a structural component of the facility as a whole. We decline to adopt such an approach. Respondent advanced a somewhat similar argument in previously decided cases. In both *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972), and *Catron v. Commissioner*, 50 T.C. 306 (1968), respondent argued that portions or areas of a single structure could not be considered individually when deciding whether or not property qualified for the investment credit. We rejected that argument and decided that portions of a structure could be viewed alone. *Central Citrus Co. v. Commissioner, supra* at 371; *Catron v. Commissioner, supra* at 313. That same principle, when applied to a facility rather than a structure, would allow the

components of the entire facility to be examined individually. Also, section 1.48–1(c), Income Tax Regs., makes it clear that tangible property is disqualified from being tangible personal property if it is a structural component of *a* building or inherently permanent structure, but nowhere within that section, nor within legislative history, is it even suggested that an entire facility should be viewed as a whole.

Here, we are not dealing with a single building but rather with a facility which encompasses 700 acres, includes processes as various as log splitting and product finishing, provides sites for production processes and support functions, and contains various buildings, structures, and shelters. We decline to view such a diverse collection of property on such an expansive tract of land as a homogeneous whole since that view would be inconsistent with our approach in *Central Citrus* and *Catron*, would be inconsistent with respondent's regulations and legislative history, and would ignore the physical reality of the facility.

Our decision that we should not view the entire facility as a whole for purposes of deciding whether the primary electric is a structural component does not eliminate respondent's contention that the primary electric should be viewed in its entirety as a system, without regard to differences among components of that system. Respondent contends that, despite being able to trace and measure the electrical flow through the primary electric, the primary electric is not directly associated with the operation of any electrical devices but rather is associated with the general provision of electrical power for an area. Therefore, respondent concludes that the primary electric must be viewed as an entire system and not as a collection of components which in combination make up a system. We disagree.

The primary electric possesses dual characteristics. It is a *system* that distributes electrical power to various parts of the facility, and yet, each component of the primary electric is *individually* responsible for the distribution of electrical power to the specific circuitry which is down the line from that component. These two aspects of the primary electric are reflected in the two basic functions of the primary electric, voltage reduction and power distribution. The systemic aspect of the primary electric is illustrated by the voltage reduction function of the primary electric. The primary electric reduces voltage at its substations from that which is received from the

Alabama Power Co. to that which is usable by the secondary electric. Thus, throughout the circuitry leading to the various substations, 13.8 kV electrical power flows. On the other hand, the individual aspect of the primary electric is illustrated by the power distribution function of the primary electric. The primary electric provides a network of circuits that delivers electrical power to the various destinations at which power is needed. The amount of electrical load on any given feeder is different from that on any other feeder; such amounts depend entirely on the kind of devices being operated on the given circuit. Thus, the ultimate use of electrical power provided by each feeder is relevant to the distribution function of the primary electric.

We are compelled to emphasize both the distribution function and the voltage reduction function of the primary electric and to reject respondent's exclusive system theory for two reasons, one legal and one scientific. First, if we were to adopt the simple view of the primary electric urged by respondent, we would have to make one of two radical determinations, either that the entire primary electric is tangible personal property, or that the entirety is not. No part of the primary electric could qualify as section 38 property unless the entire system qualified. Similarly, no part of the primary electric could be disqualified from being section 38 property if the primary electric as a system qualified. Such an approach would be improper. It would be contrary to the approach taken by this Court in the *Central Citrus Co.* and *Catron* cases requiring differentiation among parts of a building for purposes of determining whether property qualifies for the investment credit. *Central Citrus Co. v. Commissioner, supra* at 363–364; *Catron v. Commissioner, supra* at 314. Applying the rationale from the *Central Citrus Co.* and *Catron* cases to the facts here, we should differentiate among the component parts of the primary electric in deciding whether the primary electric improvements qualify as section 38 property.

Second, there are scientific reasons which support the foregoing legal reason for rejecting respondent's view that the primary electric must be considered as an indivisible whole. Respondent emphasizes the fact that the primary electric received and carried 13.8 kV electrical power, and that substations on the primary electric reduced that to one of two other voltages: 2,300 V or 480 V. Those facts about the voltage reduction function of the primary electric portray a somewhat homogeneous primary

electric system, but that portrait is incomplete because it takes into account *electrical potential* but ignores *electrical power*.

Volts (V) and kilovolts (kV) are units of electrical potential difference.[8] Amperes (A) are units of electrical current.[9] Volt-amperes and kilovolt-amperes (kVA) measure electrical power and are the product of electrical potential and electrical current.[10] Thus, from a purely theoretical standpoint, electrical power (kVA) is a more comprehensive measurement than is electrical potential (kV or V). For that reason alone, we would not exclude from our analysis data relating to power demand; furthermore, we are convinced of the importance of power consumption data by the actual scientific facts proven in this case.

As described in our findings of fact, those who designed the primary electric began the design process by identifying the functions to be performed at the facility and the electrical devices that would be used to carry out those functions. The components of the primary and secondary electric, then, were chosen and arranged based upon the *power* (kVA) that would be required by the electric devices which the designers had decided to use. It has been demonstrated that the demand for power actually differs from feeder to feeder, reflecting the different uses of power on each feeder. Correspondingly, it has been demonstrated that power capacity differs from substation to substation, reflecting the different devices to be served by each substation. These factors clearly show that the physical makeup of the primary electric is attributable to the variety of power demand at the facility. Thus, for both legal and scientific reasons, we recognize the heterogeneous nature of the primary

---

[8]Webster defines "volt" as "the practical mks unit of electrical potential difference and electromotive force that is equal to the difference of potential between two points in a conducting wire carrying a constant current of one ampere when the power dissipated between these two points is equal to one watt, that is equivalent to the potential difference across a resistance of one ohm when one ampere is flowing through it, and that is taken as the standard in the U.S." Webster's Third New International Dictionary (1971).

[9]Webster defines "ampere" as "the practical mks unit of electric current that is equivalent to a flow of one coulomb per second or to the steady current produced by one volt applied across a resistance of one ohm and that is taken as the standard in the U.S." Webster's Third New International Dictionary (1971).

[10]Webster defines "volt-ampere" as "a unit of electric measurement that is equal to the product of a volt and an ampere and that for direct current constitutes a measure of power equivalent to a watt and for alternating current a measure of apparent power." Webster's Third New International Dictionary (1971).

electric, and we decide that it would be inappropriate to view the primary electric solely as an entity which is not susceptible to fragmentation. Therefore, we must recognize both aspects of the primary electric, systemic and component, in deciding whether the primary electric improvements are tangible personal property.

Having determined that we should view neither the facility, nor the primary electric, as an indivisible whole, it remains for us to decide whether any of the primary electric improvements are structural components of a building and, thus, do not qualify as tangible personal property under section 1.48–1(c), Income Tax Regs. The term "building" and the term "structural components," as both are used in section 1.48–1(c), Income Tax Regs., are terms of art.

The word "buildings" as used above in the statute and regulations has caused much consternation among taxpayers and has produced a correspondingly large amount of litigation. See, e.g., *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974); *Satrum v. Commissioner*, 62 T.C. 413 (1974); *Brown & Williamson Tobacco Corp. v. United States*, 369 F. Supp. 1283 (W.D. Ky. 1973), affd. per curiam 491 F.2d 1258 (6th Cir. 1974). That word is defined by section 1.48–1(e)(1), Income Tax Regs., which provides in part as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

Such language is derived from the Technical Explanation of the

Revenue Act of 1962. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 516; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 858–859. The regulation is consistent with its legislative source.

It is appropriate at this juncture to emphasize the exceptions contained in the foregoing subparagraph. If a structure otherwise fits the definition of a "building" provided in that subparagraph, it will nevertheless not be classified as a building if it is a structure which is essentially an item of machinery or equipment. Likewise, an otherwise qualifying structure will not be classified as a building if it is a structure which houses property used as an integral part of certain activities, or if the use of the structure is so closely related to the use of such property that both the structure and the property within have identical useful lives.

In applying the foregoing definition of a "building" in previous cases, we have used a test based upon the function or use of the structure in issue. See *Satrum v. Commissioner, supra* at 416–418; *Central Citrus Co. v. Commissioner,* 58 T.C. 365, 370–372 (1972); *Catron v. Commissioner,* 50 T.C. 306, 310–311 (1968). An important factor in the application of the function or use test is the amount of working space provided by the structure.

The proper inquiry, which goes to the *nature* of the employee activity inside the structures, is "whether the structures provide working space for employees that is more than merely incidental to the principal function or use of the structure." Brown-Forman Distillers Corp. v. United States, 499 F.2d 1263, 1271 (Ct. Cl. 1974). *See* Robert E. Catron, 50 T.C. 306, 316 (1968) (reviewed by the full Court). [*Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir. 1974), revg. 59 T.C. 122 (1972).]

With these principles and the text of the regulations in mind, we have examined the various structures that are in issue and determined whether or not they are buildings.

Respondent determined that the following structures at the facility are buildings:

| *Area* | *Structure* |
|---|---|
| I. Pulpmill | |
| A. Wood handling and storage area.....(1) | Woodyard crane shed |
| (2) | Substation structure |
| (3) | Substation structure |
| B. Wood processing area...................(1) | Log sorting structure |
| (2) | Substation structure |
| (3) | Chipper structure |

C. Digester, washing, and screening
    area ........................................(1) Continuous digester, knotting,
                                                 washing, and screening
                                                 structure
                                          (2) Batch digester structure
                                          (3) Traveling belt conveyor structure

D. Liquor recovery and evaporation
    area ........................................(1) Recovery boiler structure
E. Liquor preparation area ...............(1) "Assorted structures"
F. Bleach plant..............................(1) Bleach plant No. 1 structure
                                          (2) Bleach plant No. 2 structure
                                          (3) Bleach plant No. 3 structure

II. Fluff dryer ...............................(1) Fluff dryer structure

III. Paper machines..........................(1) No. 1 paper machine structure
                                          (2) No. 2 paper machine structure
                                          (3) No. 4 paper machine structure
                                          (4) No. 7 paper machine structure
                                          (5) No. 8 paper machine structure

IV. Finishing department....................(1) Finishing building

V. Waste treatment plant....................(1) Sludge filter structure
                                          (2) Substation structure

VI. 13.8-kV switchgear......................(1) Switchgear structure

Petitioner concedes that the woodyard crane shed, which is located in the wood handling and storage area of the pulpmill, and the finishing building are buildings within the meaning of section 1.48–1(e)(1), Income Tax Regs. Petitioner contends, however, that the other enumerated structures are not buildings. We note that petitioner has the burden of proving that respondent's deficiency determination is incorrect. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. The controversy about the structures listed above concerns their classification as buildings and the related determination that the primary electric improvements are structural components of buildings. Petitioner bears the burden of proving that the above structures are not buildings. It has successfully proved that some of the structures are not buildings, but it has failed in its burden of proof with regard to other structures.

The four substation structures which are listed above are special purpose structures. They contain only electrical equipment, exist for the sole purpose of providing a closed and controlled environment for that equipment, and provide no working space other than that necessary to provide access for

inspection and repair of the electrical equipment. The four substation structures are not buildings under the function or use test described above.

The log sorting structure, which is located in the wood processing area of the pulpmill, is comprised of a corrugated metal roof and its supports. The structure has no sides. The roof provides shelter for two conveyor belts carrying logs across a deck and for the workers who sort those logs. The log sorting structure is not a building because it has no walls which enclose the space protected by its roof.

The chipper structure, which is located in the wood processing area of the pulpmill, is designed to keep the chipper and its open motor out of the elements. The structure is roofed and is partially enclosed by sides. The structure was erected after the chipper was put in place during the 1964 expansion; it would not be practical to remove the chipper without dismantling the structure; the structure and the chipper have the same useful life. The chipper structure is not a building because it fits the second exception of section 1.48–1(e)(1), Income Tax Regs., namely, that it is a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i), and the use of the structure is so closely related to the use of the chipper that the structure can be expected to be replaced when the chipper is replaced. (Hereinafter, this will be referred to as the second exception of section 1.48–1(e)(1), Income Tax Regs.)

The continuous digester, knotting, washing, and screening structure, which is located in the digester, washing, and screening area of the pulpmill, is a fully enclosed and roofed structure. It is designed specially for the machinery that it houses. The useful life of the structure is the same as that for the machinery located within. The structure is built to provide a clean environment for the processes which it houses, ensuring that bad weather does not contaminate the washing floor or the uncovered vats. This structure is not a building because it fits the second exception of section 1.48–1(e)(1), Income Tax Regs.

The batch digester structure, which is located in the digester, washing, and screening area of the pulpmill, is a modular structure with a roof and sides. The batch digester is enclosed to prevent dirt from entering the digester while it is being filled with wood chips. The useful life of the structure and the digester

are identical. This structure is not a building because it, too, fits the second exception of section 1.48–1(e)(1), Income Tax Regs.

The traveling belt conveyor structure, which is located in the digester, washing, and screening area of the pulpmill, houses a conveyor which carries wood chips from chip bins or silos to the digesters. This structure is suspended in air between the silos and digesters and has no working space within it. This structure is not a building under the function or use test.

The recovery boiler structure, which is located in the liquor recovery and evaporator area, supports a 125-foot-high boiler. The boiler is hung from the top beams of this structure. The structure was specially designed for this unusual function, and the useful life of the boiler is the same as that of the structure. This structure is not a building because it fits the second exception of section 1.48–1(e)(1), Income Tax Regs.

The "assorted structures" in the liquor preparation area of the pulpmill do not have sides which enclose a space, and, therefore, do not meet the definition of "building" provided in section 1.48–1(e)(1), Income Tax Regs.

The bleach plant structures house washers, tanks, pumps, and a control room. These structures are tall because the washers must be far enough above the ground to use a barometric lag to create a vacuum which pulls water through the wood fiber and the washer. The overall size of the structures was dictated by the size of the washer vats. The useful life of the structures is the same as that of the machinery housed by the structures. These structures are not buildings because they fit the second exception of section 1.48–1(e)(1), Income Tax Regs.

The fluff dryer structure housed the fluff dryer, which was added in the 1964 expansion but was later dismantled and removed. Use of the fluff dryer was discontinued because it proved to be an economically unattractive process, not because it was at the end of its useful life. Petitioner, however, offered no testimony to establish that the useful life of the fluff dryer and fluff dryer structure were the same when they were installed during the 1964 expansion. In the absence of such proof, the second exception of section 1.48–1(e)(1), Income Tax Regs., does not apply to the fluff dryer structure, and since it otherwise qualifies as a building, we have found that it is a building.

The paper machine structures are enclosed and roofed. They house the paper machines and fit the general definition of

"building" that we have set forth above. Although some modification to the structures would be necessary if old paper machines were replaced with new ones, the useful life of the structures is longer than the useful life of the machinery which they house. The paper machine structures are buildings.[11]

The sludge filter structure is enclosed and roofed. It is elevated above the ground to allow trucks to drive under the body of the structure and receive discharged fiber and ash sludge. Sludge thickeners are located within the sludge filter structure. The useful life of the sludge thickeners is shorter than that of the structure, and if the sludge thickeners were to be replaced, new ones would be placed within the same structure. The sludge filter structure is a building.

The switchgear structure is a special purpose structure. It contains only electrical equipment, exists for the sole purpose of providing a closed and controlled environment for that equipment, and provides no working space except that which is necessary for maintenance and repair of the equipment. This structure is not a building under the function or use test.

Section 1.48–1(e)(2), Income Tax Regs., identifies "structural components" mainly by example, providing in pertinent part as follows:

> (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building.

At first glance, the foregoing language seems definitely to describe certain of the primary electric components, since the cables in the instant case are "electric wiring," and "electric wiring and lighting fixtures" are classified above as structural components. Although we give great weight to respondent's regulations, it would be improper to read the words "electric

---

[11]Contra, *Boise Cascade Corp. v. United States*, an unreported case (D. Idaho 1977, 39 AFTR 2d 77–908, 77–1 USTC par. 9286), in which a jury found a paper machine structure not to be a building. See Rev. Rul. 79–182, 1979–1 C.B. 42.

wiring" in a vacuum and conclude that those electric cables, therefore, must be structural components. Rather, the effect of the final element of that same subparagraph, which reads "and other components relating to the operation or maintenance of a building," must be taken into account. That final element functions as a descriptive phrase intended to present the basic test used for identifying structural components. The preceding elements are examples of items which meet that test as a general rule. Items which occur in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components despite being listed in section 1.48–1(e)(2), Income Tax Regs. Illustrative of that point is the treatment explicitly provided for components of a central air-conditioning or heating system:

> However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components." [Sec. 1.48–1(e)(2), Income Tax Regs.]

Nor should such an approach be limited strictly to air-conditioning and heating systems. Section 1.48–1(e)(2) is derived from language contained in technical explanations of the Revenue Act of 1962. Such explanations provide as follows: "The term "structural components" of a building includes such parts of the building as central air-conditioning and heating systems, plumbing, and electric wiring and lighting fixtures, relating to the operation and maintenance of the building." H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 503, 516; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 841, 859. Accordingly, the critical test for all primary electric improvements is whether they relate to the overall operation and maintenance of a building.[12] See *Central Citrus Co. v. Commissioner*, 58 T.C. 365

---

[12]The use of the word "relate" is worth noting. The location of property may be important in some ways regarding qualification for the investment credit. See, e.g., sec. 1.48–1(c), Income

(1972); *Ponderosa Mouldings, Inc. v. Commissioner*, 53 T.C. 92 (1969).

The focus of such a test is on the ultimate uses of power at the facility. The power used to meet the demand of process machinery is not used in the overall operation or maintenance of a building. Of the other electrical load, power used to meet the demand of yard lighting, 440-V power receptacles, and air-conditioning of the primary electric is not used in the overall operation or maintenance of a building. Other electrical load, which is used for general building services such as lighting, heating, ventilation, and air-conditioning, is used in the operation or maintenance of a building.

Respondent cited *Ponderosa Mouldings, Inc. v. Commissioner*, *supra*, to support his theory that the primary electric improvements are structural components.[13] The petitioner in *Ponderosa Mouldings* argued that because of the fire hazard in the manufacture of its wood moldings, its sprinkler system should be considered as, in effect, machinery necessary to its operation and not as a structural component which is a part of the operation or maintenance of the building. We disagreed and held that the entire sprinkler system was a proscribed structural component. The facts in the instant case are distinguishable from those in *Ponderosa Mouldings*. Simply stated, the sprinkler system in *Ponderosa Mouldings* protected the continuing operations of the taxpayer, there, but the taxpayer's business could continue unabated without a sprinkler system. In the case before us now, petitioner's business operations would cease without the primary electric. Because of this significant distinction, *Ponderosa Mouldings* does not control the outcome here.

We have shown that the investment credit was enacted to encourage expenditures for machinery and equipment, and, thus, to increase productivity. The primary electric improvements generally fill that order. The primary electric consists of

---

Tax Regs. When deciding whether property is a structural component of a building, however, the location of the property does not control the determination. Property can *relate* to the overall operation and maintenance of a building, even though it is not located within the building. This factor emphasizes the importance of the function of property relative to its qualification for the investment credit.

[13]That case also is cited to support respondent's contention that the primary electric should be viewed as an indivisible entity. We have rejected that contention; and the application of *Ponderosa Mouldings, Inc. v. Commissioner*, 53 T.C. 92 (1969), to this case does not convince us otherwise.

electrical equipment made for refining and distributing an ingredient, electrical power, which is essential to the entire production process. When the production process was expanded in 1964, expansion of the primary electric was also necessitated. Without the primary electric improvements, the new paper- and pulp-making machinery and processes which were added in the 1964 expansion could not operate. Conceptually, the primary electric improvements are as closely related to the increased production of the facility as are the new paper machines. The only blemish on the primary electric improvements is their slight function as providers of electrical service to buildings. Since the investment credit was not intended to reward building improvements, it seems improper to allow the investment credit in respect of electrical devices which provide such improvements. Fortunately, a logical and objective measure of electrical load exists, allowing an allocation between the structural and process functions which are served by the electrical components. Such an allocation fulfills the purpose of the investment credit.

Respondent, however, contests the propriety of such an allocation, despite the fact that he used a similar allocation for the secondary electric improvements. He distinguishes the circumstance of the primary electric from that of the secondary electric by their respective closeness to the consumptive devices. The elements of the secondary electric are closely identifiable with the devices which ultimately consume power, since elements of the secondary electric such as motor load centers and motor control centers finally control the amount of power that the various consumptive devices receive. On the other hand, the primary electric is one step removed from the consumptive devices, the secondary electric system intervening. Nevertheless, the primary electric exists to channel and refine power for ultimate consumption, the secondary electric could not perform its function without that primary refinement, and the design of the primary electric was shown to be a direct reflection of the need for electrical power at the facility. Therefore, we conclude that it is appropriate to break down the electrical load carried by the primary electric in the same way as that of the secondary electric—by the amount of load caused by each category of consumptive device, i.e., lighting, ventilation, air-conditioning, process machinery, etc. Thus, it is appropriate to allow an investment credit for the primary electric improvements in a

manner similar to that used by respondent with respect to the secondary electric improvements, i.e., by reference to circuit diagrams and electrical loads. To the extent that the primary electric carried electrical loads to be used for pulp and paper production processes or other such qualifying uses, the investment credit will be allowed for the primary electric improvements.

To the extent that the primary electric improvements relate to the overall operation and maintenance of buildings, they are structural components of such buildings, and they do not qualify as tangible personal property. *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972); *Ponderosa Mouldings, Inc. v. Commissioner*, 53 T.C. 92 (1969); sec. 1.48–1(c), Income Tax Regs. Each of the primary electric improvements relates to the overall operation or maintenance of a building to the extent that the electricity it carries is used for such a function. Thus, for example, if a new substation were installed, to the extent that it provides power for functions which can be characterized as building service, it is a structural component of that building. To calculate the investment credit allowable in respect of the primary electric improvements, the following procedure is proper. For each substation added in the 1964 expansion, calculate the percentage of the electrical power carried by that substation which is due to general building services; the same percentage of the substation is used to provide general building services, is a structural component of a building, and is not tangible personal property. For switchgear and cables, calculate the percentage of electrical power carried by the related feeder which is due to general building services; the same percentage of the switchgear and cables is used to provide general building services, is a structural component of a building, and is not tangible personal property. The remainder of the primary electric improvements qualify as tangible personal property under section 48(a)(1)(A) and the regulations enacted thereunder.

Tangible property that does not qualify under section 48(a)(1)(A) as tangible personal property is "other tangible property" as that term is used in section 48(a)(1)(B). Each of the clauses under section 48(a)(1)(B) describes other tangible property that qualifies as section 38 property. Here, qualification of the primary electric improvements under clause (i) of section 48(a)(1)(B) is at issue. The primary electric improvements which

meet the following four criteria qualify as section 38 property under section 48(a)(1)(B)(i): (1) That such improvements are tangible property other than tangible personal property; (2) that such improvements are property exclusive of buildings or their structural components; (3) that such improvements are used as an integral part of Scott's activities at the facility; and (4) that such activities are manufacturing, production, or extraction, or furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services.

The reason that certain portions of the primary electric improvements are not tangible personal property is that they are structural components of buildings. That infirmity is as fatal to qualification under section 48(a)(1)(B) as it was under section 48(a)(1)(A). Thus, only the primary electric improvements which are tangible personal property qualify as section 38 property.

In accordance with the foregoing, the same allocation of asset values will be made between Scott's machinery and equipment account and building and land improvement account for purposes of determining the useful life and allowable depreciation for the primary electric improvements.

*Decisions will be entered under Rule 155.*